**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARSHA WILCHFORT on behalf of herself and all others similarly situated, | Civil Action No.: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| GLADE M. KNIGHT, APPLE REIT EIGHT, INC., APPLE SIX ADVISORS, INC., APPLE REIT SEVEN, INC., APPLE EIGHT ADVISORS, INC. and APPLE FUND MANAGEMENT, LLC, APPLE SEVEN ADVISORS, INC., APPLE HOSPITALITY REIT, INC., BRE SELECT HOTELS CORP., GLENN W. BUNTING, KENT W. COLTON, LISA B. KERN, BRUCE MATSON, MICHAEL S. WATERS and ROBERT M. WILEY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, as and for her Class Action Complaint, alleges the following upon information and belief, based upon the investigation of her attorneys and upon her own personal knowledge, as to her former ownership of the stock of Apple REIT Six, Inc., Apple REIT Seven, Inc. and Apple REIT Eight Inc. ("A-6", "A-7" and "A-8" respectively) and her participation in the Dividend Reinvestment Plan ("DRIP") of each of A-6, A-7 and A-8 during the Class Period.

**I.**

**NATURE OF THE ACTION**

1.      This is a class action asserting claims on behalf of the pre-merger public common shareholders of Apple REIT Six, Inc., Apple REIT Seven and Apple REIT Eight, Inc., who participated in the A-6, A-7 and/or A-8 DRIP from July 17, 2007, through the later of the

termination and/or suspension of their respective DRIPs or February 12, 2014 (the "Class Period").

2.      During the Class Period, A-6, A-7 and A-8 contracted with their respective unitholders to allow A-6, A-7 and A-8 respectively to provide consenting DRIP participants with "units" in lieu of the cash dividends declared.  As part of the contract A-6, A-7 and A-8 agreed to value the units at "fair market value" deemed to be the last arms-length transaction in the units and further agreed to re-evaluate the worth of the units in good faith and adjust same to be equal to fair market value.

3.      During the Class Period, A-8 Class members agreed to forego approximately $99 million of declared cash dividends and, instead, selected in lieu of the cash dividend A-8 shares.

4.      During the Class Period, A-7 holders agreed to forego $124.5 million in cash dividends in exchange for 11.3 million units issued by A-7.

5.      A-6 holders agreed to forego $202.00 million in cash dividends in exchange for 18.4 million units issued by A-6 in lieu thereof during the Class Period.

6.      For conversion purposes, all of the Apple REITs valued the shares to be received in lieu of cash dividends at $11.00 share throughout the entire Class Period.

7.      Plaintiff and the members of the Class and each of the subclasses did not receive enough A-6, A-7 and/or A-8 shares in the DRIPs to be equal to the dollar value of the cash dividend because Defendants utilized an $11.00 valuation of shares for calculating the number of shares which DRIP electors would receive in lieu of the declared cash dividend even though the fair market value was materially below.

8.      Plaintiff received dividend distributions on her A-6, A-7 and A-8 investment, which she was permitted to accept in cash or Apple REIT units.  Pursuant to the contract, she

elected to receive units instead of cash and contracted with A-6, A-7 and/or A-8 to receive fairly valued units. She reasonably expected that the number of units she would receive in lieu of cash would be based on the then "fair market value" of the units. But instead the Defendants dictated that the A-6, A-7 and A-8 units would be valued at $11.00 per unit for purposes of calculating the amount of units she would receive in return for her reinvestments of dividends throughout the Class Period despite the fact that during the Class Period, the Units were not worth $11 each.

9.      The Apple REITs are "non-traded REITs" because their shares are not registered for trading on any exchange. Because there was no public market for Apple stock, Plaintiff and the Class were only allowed to exchange their cash dividends based on the exchange ratio and valuations of Apple REIT units set by the Defendants.

10.      The DRIP allowed Apple REITS Six, Seven and Eight to conserve cash during the Class Period, a time when they were forced to borrow cash from each other and from Glade Knight personally. The manner in which Defendants set the value was contrary to law and to the contract made to DRIP reinvestors and overvalued the DRIP shares to DRIP reinvestors' disadvantage. An SEC investigation found that "Apple REITs' management received internal strategic planning analyses between late 2008 and 2011 that contradicted the REITs' representations in their Forms S-3 that $11.00 constituted the 'fair market value' of the units and contradicted the 'estimated market value' of the units in their Forms 10-K." (Emphasis supplied.) SEC Order ¶28.

11.      As detailed in *In the Matter of Apple REIT Eight, Inc., et al.*, Securities & Exchange Commission Admin. Proceeding, No. 3-15750 in the "Order Instituting Cease-And-Desist Proceedings . . . Making Findings, And Imposing Civil Penalties ("Order"), Defendants knew that $11.00 per share did not represent the "fair market value" of either A-6, A-7 or A-8

shares and therefore knew that $11.00 should not have been the price used to value the DRIP shares.

12.    Defendants' acts and omissions therefore give rise to the causes of action asserted herein and have caused Plaintiff and Class members to suffer damages.

## II.

## THE PARTIES

### A.  Plaintiff

13.    Plaintiff Marsha Wilchfort was a unitholder of A-6 before it was sold to a third party, and was a unitholder of A-7 and A-8 at all relevant times before A-7 and A-8 were merged into Apple REIT Nine, Inc. on or about February 25, 2014, which became Defendant Apple Hospitality REIT, Inc. ("AHR").  During the Class Period, she elected to reinvest her A-6, A-7 and A-8 dividends in Apple REIT units rather than take the cash offer of dividends.

### B.  Defendants

14.    Apple Hospitality REIT, Inc. ("AHR") is the successor company to Apple Seven REIT, Inc., Apple Eight REIT, Inc. and Apple Nine REIT, Inc. ("A-7", "A-8" and "A-9").

15.    Defendant Apple REIT Seven, Inc. ("A-7") is now a wholly-owned subsidiary of Apple Hospitality REIT, Inc.  Before the merger and throughout the Class Period, A-7 was a Virginia corporation with its common units registered under Section 12(g) of the Securities Exchange Act of 1934 (the "Exchange Act") and was subject to the reporting requirements of Section 13(a) of the Exchange Act.  It was acquired by AHR on or about February 25, 2014, in the merger of A-7, A-8 and A-9.  Prior to the merger it was owned by its unitholders, including Plaintiff.  A-7 raised approximately $1 billion from sale of units when it was formed in May 2007.  It instituted its DRIP on July 17, 2007, and discontinued it in June 2013.  As of December

4

31, 2012, A-7 had issued approximately 11.3 million units to DRIP electors in exchange of approximately $124.5 million worth of declared cash dividends.

16.     Apple REIT Eight, Inc. ("A-8"), was, before the merger, a non-traded REIT organized under the laws of Virginia with a class of securities registered under Section 12(g) of the Exchange Act and was subject to the reporting requirements of Section 13(a) of the Exchange Act. After the merger, it was merged into Apple REIT Nine, Inc., which changed its name to AHR, but A-8 remained a wholly-owned subsidiary of AHR. A-8 raised approximately $1 billion between January 2007 and April 2008, and had approximately 19,700 beneficial unit-holders as of February 28, 2013. As of December 31, 2012, A-8 had issued approximately 9.1 million units to DRIP electors in exchange for approximately $99.9 million worth of declared cash dividends.

17.     Defendant BRE Select Hotels Corp. ("BRE") is named herein as a successor-in-interest to Apple Six REIT, Inc. with which it merged on May 14, 2013. Apple REIT Six, Inc. ("A-6"), at all times relevant herein, was a non-traded REIT organized under the laws of Virginia with a class of securities registered under Section 12(g) of the Exchange Act and was subject to the reporting requirements of Section 13(a) of the Exchange Act. A-6 raised approximately $1 billion between January 2004 and March 2006, and had approximately 19,500 beneficial unitholders as of February 15, 2013. A-6 instituted a DRIP by filing a Form S-3 registration statement on February 10, 2006, which it amended and restated on May 14, 2009. As of December 31, 2012, A-6 had sold a total of approximately 18.4 million units representing $202.1 million in proceeds pursuant to these DRIP offerings.

18.     Defendant Glade M. Knight was the Chairman and Chief Executive Officer of A-6, A-7 and A-8 during the Class Period. He was also the direct or indirect owner of all of the

5

related entities that provide property management, acquisition, advisory, operational, and managerial services to A-7 and A-8, including the Apple REIT entity Defendants named herein. Knight reviewed and signed the Forms S-3, 10-Q and 10-K which incorporate by reference, in part, the proxy statements identified herein.

19.      Defendants Lisa B. Kern, Bruce H. Matson, Michael S. Waters, Robert M. Wiley and Glade M. Knight were at all times relevant to these claims the directors of Apple REIT Six, Inc. (the "A-6 Director Defendants") who were responsible for setting the DRIP price and were in the unique position of being able to ensure compliance by A-6, A-7 and A-8 with the DRIP contracts and to ensure that Plaintiff and class members' reasonable expectancy to a fairly calculated DRIP price were met.

20.      Defendants Glenn W. Bunting, Kent W. Colton, Lisa B. Kern, Bruce Matson and Glade M. Knight were at all times relevant to these claims the directors of Apple REIT Seven, Inc. (the "A-7 Director Defendants") who were responsible for setting the DRIP price and were in the unique position of being able to ensure compliance by A-6, A-7 and A-8 with the DRIP contracts and to ensure that Plaintiff and class members' reasonable expectancy to a fairly calculated DRIP price were met.

21.      Defendants Glenn W. Burting, Kent W. Colton, Michael S. Waters, Robert M. Wiley and Glade M. Knight were at all times relevant to these claims the directors of Apple REIT Eight, Inc. (the "A-8 Director Defendants") who were responsible for setting the DRIP price and were in the unique position of being able to ensure compliance by A-6, A-7 and A-8 with the DRIP contracts and to ensure that Plaintiff and class members' reasonable expectancy to a fairly calculated DRIP price were met.

22.     Apple Six Advisers, Inc. ("A6A"), is/was a Virginia corporation wholly owned by Glade M. Knight, which was the advisor to A-6 during the Class Period. The advisory agreement required A6A to provide, *inter alia,* day-to-day management services to A-6 and it provided for an annual asset management fee ranging from 0.1 to 0.25% of the amount raised in the offerings.

23.     Apple Eight Advisors, Inc. ("A8A"), is/was a Virginia corporation wholly owned by Glade M. Knight, which was the advisor to A-8 during the Class Period. The advisory agreement required A8A to provide, *inter alia,* day-to-day management services to A-8 and it provided for an annual asset management fee ranging from 0.1 to 0.25% of the amount raised in the offerings.

24.     Apple Seven Advisors, Inc. ("A7A") is/was a Virginia corporation wholly owned by Glade M. Knight which was the adviser to A-7 during the Class Period. The advisory agreement required A7A to provide, *inter alia,* day-to-day management services to A-7 and it provided for an annual asset management fee ranging from 0.1 to 0.25% of the amount raised in the offerings.

25.     Apple Fund Management, LLC ("AFM"), a wholly-owned subsidiary of Apple REIT Six during the relevant time period, was an entity utilized by the A6A, A7A and A8A (which had no employees), to provide the management services, including the executive officers, required by the advisory contracts to, *inter alia,* A-6, A-7 and A-8.

26.     A8A, A7A, A6A and AFM were, upon information and belief, the management team of the Apple REITs that formulated the dividend policies, and recommended to directors of A-6, A-7 and A-8 the declaration of dividends and distributions, and recommended the $11.00

7

valuation to be used to calculate the value of the DRIP shares which was adopted by the Director Defendants.

## III.

### JURISDICTION AND VENUE

27.　　This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and/or § 1332(d)(2).  This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000 and at least one Class member is a citizen of a state different from a Defendant.

28.　　Venue is proper under 28 U.S.C. § 1391(a) and (b) because a substantial part of the acts and omissions giving rise to the claims in this action occurred in this District.

## IV.

### CLASS ALLEGATIONS

29.　　This action is brought by Plaintiff, for herself and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and b(3).  Plaintiff seeks to represent the following proposed class(es):

1. All persons and entities who elected to participate in the A-8 DRIP from July 17, 2007, through June 30, 2013, and received A-8 common stock in lieu of the declared cash dividend at a value of $11.00 per share.

2. All persons and entities that elected to participate in the A-7 DRIP from July 17, 2007, through June 30, 2013, and received A-7 common stock in lieu of the declared cash dividend at a value of $11.00 per share.

3. All persons and entities that elected to participate in the A-6 DRIP from July 17, 2007 through December 2012 and received A-6 common stock in lieu of the declared cash dividend at a value of $11.00 per share.

8

30.     Excluded from each of the classes are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any of Defendants or any of Apple REIT's partners, subsidiaries, affiliates, or joint ventures.

31.     Numerosity. The members of each of the classes are so numerous and dispersed that it would be impracticable to join them individually. There were thousands of DRIP participants during the Class Period. While Plaintiff does not know the exact number of members of each of the Classes at this time, Plaintiff believes there are, at minimum, thousands of members of each of the Classes. Defendants' records contain sufficient information to determine the exact number of persons in each of the Classes.

32.     Existence and Predominance of Common Questions. Common questions of law and fact exist as to all Class members in each Class and predominate over questions affecting only individual members. These common questions include the following:

        (a)     Whether there was a contract between Class member DRIP reinvestors and their respective Apple REIT whereby Class members were to be paid units with an equivalent fair market value to the cash dividend declared;

        (b)     Was said contract breached by providing DRIP participants with units worth less than the value of the cash dividends;

        (c)     Whether Defendants' participation in the process of setting the value of units for DRIP purposes constitutes culpable conduct for purposes of the claims asserted against them;

        (d)     The true value of units for DRIP purposes at various times during the Class Period;

(e)     Whether Defendants' wrongful conduct caused Plaintiff and Class members' damages;

(f)     The amount of damage suffered by Plaintiff and Class members; and

(g)     Whether the Plaintiff and Class members are entitled to a reasonable award of attorneys' fees, interest and costs of suit and punitive damages.

33.    Typicality.  Plaintiff's claims are typical of the claims of the members of the Class(es) she represents because they all participated in one of the DRIP and received DRIP shares at the same inaccurate exchange ratio in lieu of cash dividends.

34.    Adequacy of Representation.  Plaintiff will adequately represent and protect the interests of the Classes and has no interests that conflict with or are antagonistic to the interests of Class members.  Plaintiff has retained attorneys who are experienced and capable of prosecuting class actions and complex litigation.  Plaintiff's attorneys will actively conduct and be responsible for prosecuting this litigation, and have adequate resources, experience and commitment to litigate this matter.

35.    Superiority.  A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and unduly burdensome for each of the individual class members to bring a separate action.  Moreover, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

36.    Class certification is also appropriate because there is a readily identifiable class on whose behalf this action can be prosecuted.  Class members are readily ascertainable from

10

Defendants' records. A notice of pendency or resolution of this class action can be provided to class members by direct mail, email, publication notice, or other similar means.

## V.

## SUBSTANTIVE ALLEGATIONS

A. **To Maintain Their REIT Status, The Apple REITs Were Required To Distribute 90% Of Net Income As Dividends, But To Save Cash, The Apple REITs Devised The DRIP**

37.     A real estate investment trust, or REIT, is an entity that owns and operates income-producing real estate and distributes the income to investors. REITs pool the capital of numerous investors to purchase a portfolio of properties that the typical investor might not be able to buy individually. To qualify as a REIT, a company must have most of its assets and income tied to real estate investments and must distribute at least 90% of its taxable income to shareholders annually in the form of dividends. Accordingly, if the Apple REITs wanted to exist as REITs and avoid taxes and sell shares to the public to raise capital, they were required to declare dividends in the amount of at least their (otherwise) taxable income.

38.     To be sustainable, a REIT's dividends should be funded by cash flows from the income-producing properties. From time to time during the Class Period, A-6, A-7 and A-8 could not generate sufficient cash flow to meet all their respective obligations when due. During the Class Period, to meet their respective current obligations, A-6, A-7 and A-8 required cash infusions from other Apple REITs and Glade M. Knight personally and other Apple companies owned by Glade M. Knight, which borrowings concealed from Plaintiff and Class members.

39.     The Apple REITs were also subject to a number of regulations that must be complied with for REITs to retain their federal income tax-exempt status. There was one particular IRS regulation which affected the Apple REIT DRIP programs. IRS rules require that

11

REITs sell their DRIP units at reasonably accurate fair market value so that unitholders reinvesting dividends receive equivalent value of the cash dividend.

40. Apple REITs were not publicly listed or traded; thus, it was for the Apple REIT directors to make "a reasonably accurate determination of the fair market value of units" in order to be in compliance with IRS regulations and ensure that A-6, A-7 and A-8 maintain their REIT status. SEC Order ¶ 26.

41. Defendants knew and understood this because they were experienced REIT operators with in-house legal counsel.

42. All of the Apple REIT units originally sold for $11.00 per unit (after the first 5% was sold for $10.50 at issuance). The Apple REITs never allowed this "official" par valuation to be changed even after it became apparent that A-6, A-7 and/or A-8 were worth significantly less than $11.00 per share.

43. Following the close of their initial offerings, the Apple REITs each instituted a DRIP wherein they offered the unitholder the choice of receiving units in lieu of dividends. The applicable securities regulations required the Apple REITs to "register" the units issued in the DRIP. The required registration form was on "SEC Form S-3" also known as "Registration Statement Under The Securities Act of 1933" ("Form S-3"). SEC rules and regulations mandate the inclusion of true, accurate and complete information on specifically designated subjects and issues and on general issues relevant to the issuance of securities pursuant to the Form S-3. Each of the Apple REITs was also subject to rules and regulations of disclosure under the Exchange Act, which governed the contents of quarterly ("10-Q") and annual ("10-K") financial statements.

44. Item 5 of Form S-3 requires registrants to include a description pursuant to Item 505 of Regulation S-K of the "various factors considered in determining [the] offering price" where common equity is being registered for which there is no established public trading market. Item 5 of Form 10-K requires registrants to furnish, pursuant to Item 201 of Regulation S-K, certain high and low bid information if the principal United States market is not an exchange, and to qualify such quotations with an appropriate explanation "[w]here there is an absence of an established public trading market."

45. The Apple REIT units did not trade on any securities exchange and were not liquid. The Apple REITs did not have sufficient controls in place to meaningfully evaluate whether changes in market conditions or other factors required changes to their valuation disclosures in their Forms S-3 and Forms 10-K. $11.00 thus became the "default" valuation for the DRIP shares, despite significant reliable evidence which reflected that the "fair value" and/or "market value" of A-6, A-7 and/or A-8 units were less than $11.00/share.

46. Until May 2011, David Lerner Associates' (DLAs) monthly customer account statements showed an $11.00 market price and market value for the units of each of the Apple REITs. DLA was the only broker through whom Apple REIT shares were redeemable or "tradeable," at least in theory.

47. There was an unofficial DLA statement that said that the share prices were calculated using several factors, including the then-current value of the assets in each Apple REIT: "The per share estimated values for the Apple REIT securities are based on information provided by the issuer in the Annual Reports and are developed after considering, where appropriate: the current per share offering price; the per share price utilized in the issuer's

13

dividend reinvestment and share redemption plans; and the value of the issuer's assets."

Beginning in May 2011, however, the DLA statements have described the shares as "not priced."

**B. The Apple REITs' Contractual Undertaking With Plaintiff And Class Members**

48.     During the relevant period, the A-6 Form S-3, A-7 Form S-3 and A-8 Form S-3

DRIP Registration Statements contained statements forming the basis of the contracts between

A-6, A-7 and A-8 and each of their respective DRIP participants.

49.     The documents further elaborated on herein, include:

(a)     A-6's 2006 Form S-3 registration statement, which was in continuous use

until it was amended on May 14, 2009.

(b)     A-7's 2007 Form S-3 registration statement, which was in continuous use

until it was amended and restated on January 13, 2012.

(c)     A-7's Amended and Restated S-3, January 13, 2012, in use until the end of

Class Period.

(d)     A-8's 2008 Form S-3 registration statements, which was in continuous use

until it was amended post-effective February 19, 2013.

(e)     A-8's amended post effective S-3, February 19, 2013, in use until end of

Class Period.

(f)     A-6, A-7 and A-8's Annual Reports on Form 10-K for the annual periods

ended December 31, 2008, 2009, 2010, 2011, and 2012.

50.     In a section entitled, *"How are unit prices determined?"*, the Apple REITs' Form

S-3 registration statements, promised to DRIP participants that:

> The price of units purchased under the plan directly from us
> by dividend reinvestments will be based on the fair market value
> of our units as of the reinvestment date as determined in good
> faith by our board of directors from time to time.

14

Our units are not publicly traded; consequently, there is no established public trading market for our units on which we could readily rely in determining fair market value. Nevertheless, the board has determined that, for purposes of this plan, at any given time the most recent price at which an unrelated person has purchased our units represents the fair market value of our units. Consequently, unless and until the board decides to use a different method for determining the fair market value of our units, the per unit price for the plan will be determined at all times based on the most recent price at which an unrelated person has purchased our units. Notwithstanding the foregoing, the board of directors may determine a different fair market value and price for our units for purposes of this plan if (1) in the good faith judgment of the board an amount of time has elapsed since our units have been purchased by unrelated persons such that the price paid by such persons would not be indicative of the fair market value of our units or (2) our board determines that there are other factors relevant to such fair market value.... (Emphasis added).

## C. Defendants' Bad Faith Misdescription Of Units' Valuation For DRIP Purposes

51.     Although the Forms S-3 disclosed that "the per unit price for the plan will be determined at all times based on the most recent price at which an unrelated person has purchased our units," the disclosures omitted to state that the "fair market value" of the units however, was <u>not</u> based on appraisal of the Apple REITs' assets or other valuation methodology. It also failed to disclose that on the secondary market, as reported by services such as The Stanger Report, monitored by all non-publicly traded REIT executives, trades among unrelated persons of the A-6, A-7 and A-8 units were substantially <u>below</u> $11/share.

52.     The Forms S-3 also misleadingly represented the "Advantages and Possible Disadvantages" of the plan by failing to disclose the fact that the directors' "determination" of the "fair market value" of the units involved no analysis or verification, or estimation or comparison to any objective or internal indicia or estimate of value and that the $11 per unit could be substantially higher than fair market value.

53. A-7 filed an amended and restated Form S-3 on January 13, 2012, which, among other things, disclosed that "the market value of [its] units and the unit price of units purchased from [it] under the plan will not be based an appraisal or other valuation of [A-7], [its] net assets, or the units, and will not necessarily reflect [its] value, earnings, net worth or other measures of value, but rather will be deemed equal to the most recent price at which an unrelated person has purchased our units from [it]." A-8 filed post-effective amendments to its Form S-3 on February 19, 2013, incorporating substantially similar language.

54. Despite the representation in the Forms S-3 issued during the Class Period that the Apple REITs' boards of directors would determine in good faith the fair market value of the DRIP units from time-to-time, the Apple REITs failed to develop or maintain sufficient procedures relating to valuation of units sold in the DRIPs. The Apple REITs did not establish a valuation committee or a valuation working group. Nor did they establish any formal or informal valuation guidelines, or otherwise attempt to identify relevant factors for determining fair market value.

55. The individual Defendants approved a dividend reinvestment value for A-6, A-7 and A-8 during the Class Period at $11.00 per share even though Defendants knew that there was no support for such a valuation, and in fact objective, reliable, verifiable information contradicted the $11.00 valuation.

56. As found by the SEC (Order at 67-70), the material statements and omissions described herein with respect to A-6, A-7 and A-8's Forms S-3, amendments thereto and Proxy and Form 10-Ks constituted violations of Sections 13(a); (b); (b)(2)(A); (b)(2)(B); 14(a) of the Exchange Act; 17(a)(2) and 17(a)(3) of the Securities Act.

57.     Consequently, A-6, A-7 and A-8, for purposes of the DRIP, maintained the arbitrarily established initial offering price of $11.00 as the "fair market value" and the "estimated market value" of the units following the 2008 global financial crisis despite internal and third-party analyses suggesting that the per unit values of the Apple REITs were below $11.00, and despite declines in operating performance and reporting of secondary market trading.

## D. Defendants Ignored Information Establishing That Fair Market Value Of The Units Was Materially Less Than $11 Per Unit

58.     Defendants knew that the $11.00 offering price was not a valid reference point for setting the DRIP value because in each registration statement for the respective offerings of A-6, A-7 and A-8 they represented "the per-unit offering prices have been established arbitrarily . . . and may not reflect the true value of the units . . . ."

59.     Following the 2008 global financial crisis, Apple REIT management received internal strategic planning analyses between late 2008 and 2011 that contradicted the REITs' representations that $11.00 constituted the "fair market value" of the units as stated in their Form S-3 and the "estimated market value" of the units as stated in their Forms 10-K.

60.     For example, in late 2008, an Apple REIT employee created a basic model for an executive officer estimating A-6, A-7, and A-8's performance over a five-year period. The model was linked directly to the accounting system, was updated regularly through at least mid-2011, and was distributed to certain members of management. Although the primary purpose of the model related to evaluating future cash flow performance, the model included an estimated market value section calculating the REITs' enterprise, equity, and per share values. The estimated market values of A-6, A-7, and A-8 mostly showed per-share values below $11.00. A different analysis performed by the same Apple REIT employee for an executive officer in

17

August 2009 showed that, without substantial revenue and FFO[1] increases, the per-share values of A-6, A-7, and A-8 were below $11.00.

61.    In addition, starting in approximately mid-2009 through mid-2011, several third-party investment banks made presentations to Apple REIT management concerning potential strategic options for the Apple REITs. The estimated valuations included in these presentations varied and were not a static $11.00 per unit for A-8 as represented in their Forms S-3 and Forms 10-K. Most of the per-unit valuation estimates were below $11.00 for A-8.

62.    A-8's operating performances following the 2008 global financial crisis also should have caused the Apple REITs to amend their disclosure of $11.00 as a "fair market value" and "estimated market value" of units. A-8's net income declined more than 40% in 2009 as compared to 2008, and remained below 2008 levels through at least December 31, 2012.

63.    A-8 also increased its debt levels between 2008 and 2012. Increased debt levels may affect the Apple REITs' valuations because any debt incurred by the REITs must eventually be repaid, thereby reducing the equity available for distribution to unit-holders in connection with a liquidity event. A-8 nonetheless never adjusted the $11.00 per-unit valuation disclosures.

64.    Starting in May 2011, DLA changed the estimated market price and estimated market value for Apple REIT shares on its customer account statements from $11.00 to "not priced." DLA deleted the explanation of how the share value was calculated from the statements, and gave no explanation for the change to "not priced."

65.    The SEC has determined that the A-6, A-7 and A-8 units were overvalued at $11.00 per unit for purposes of the DRIPs.

---

[1]    FFO, or Funds From Operations, is defined by the National Association of Real Estate Investment Trusts as net income (computed in accordance with GAAP), excluding gains/losses on sales of depreciable property, plus depreciation and amortization of real property used in operations, less preferred dividends and after adjustments for unconsolidated partnerships and joint ventures.

66.     Apple REIT Seven disclosed that unrelated persons purchased units in the

company for much less than $11 per share:

> . . . bidders announced that they acquired 23,602 Units for $3 per
> Unit. In December 2011, the bidders announced that they
> acquired an additional 25,989 Units for $4 per Unit. The total
> Units acquired by these tender offers were 49.591. or
> approximately 0.05% of the Company's outstanding Units. The
> weighted average price paid for shares through the tender offer
> and the Company's Unit Redemption Program in 2011 was
> $10.85. In February 2012, the bidders made another tender
> offer for $5 per Unit. The offer expires in April 2012.

Apple REIT Seven, 10-K. March 2013.

67.     Despite disclosing these purchases by unrelated parties, Apple REIT Seven

continued to sell shares into the DRIP at $11 per share.

68.     Apple REIT Eight similarly disclosed that unrelated persons had purchased

units for much less than the $11 DRIP price. Nevertheless, Apple REIT Eight's board

continued to sell shares into the DRIP at $11 per share, specifically:

> . . . two tender offers made for the Units of the Company by the
> same bidders. The weighted average price paid for the 17,403
> (0.02% of the outstanding Units) acquired through the offers was
> $3.13 per Unit. In February 2013, the same bidders announced a
> tender offer to purchase Units of the Company for $3.50 per
> Unit; unless extended, the offer expires in March 2013.

Apple REIT Eight, 10-K, March 2013.

69.     Once again, Defendant ignored this information when pricing the DRIP shares,

despite the promise to value the shares in the manner described above.

70.     In a June 2, 2011, New York Times article about DLA and the Apple REITs

entitled "Statements Skip Over REIT's Woes," Defendant Knight was quoted as saying, "Who

knows what the value is? I would not be comfortable in saying it was $4, $5, or $6. If I said I

could sell it for $12, I would be sued."

71.     In June 2011, Mackenzie, Patterson, Fuller, LP ("MPF"), a company engaged in trading discounted and distressed real estate securities, offered to purchase A-8 shares for $3 per share and estimated that the liquation value of A-8 was approximately $4.10 per share. The REITs recommended rejection of the tender offer and stated that, as of March 31, 2011, the A-8 shares had a per unit "book value" of $7.57.

72.     In September 2011, MPF made a new tender offer of $4 per share for A-8, estimating that the liquidation value for A-8 was approximately $4.26 per share. Defendants again recommended rejection of the offer and stated that as of June 30, 2011, the per unit book value of A-8 shares was $7.42.

73.     According to its public filings, Apple REIT Seven's shares declined in value each year, and by the end of 2012, had a book value of only $6.87.

74.     Nevertheless, as of March 2013, Apple REIT Seven was still selling shares to DRIP plan participants at the unchanged price of $11.00 per share.

75.     As with Apple REIT Seven, Apple REIT Eight suffered similar declines. Indeed, as of March 2013, Apple REIT Eight's book value was down to $6.67 per share.

76.     Nevertheless, as of March of 2013, Apple REIT Eight was still selling shares to DRIP plan participants at the unchanged price of $11.00 per share.

## COUNT I

### BREACH OF CONTRACT AGAINST A-6, A-7 AND A-8 AND AGAINST APPLE HOSPITALITY INC. AS SUCCESSOR IN INTEREST TO APPLE REIT SEVEN, INC. AND APPLE REIT EIGHT, INC. AND AGAINST BRE AS SUCCESSOR IN INTEREST TO APPLE REIT SIX, INC.

77.     Plaintiff repeats and realleges each and every allegation of the Complaint as if more fully set forth herein.

78.     A-6, A-7 and A-8, as defined herein, issued an offer to Plaintiff and the Class, and made a contract with Plaintiff and all Class members that A-6, A-7 and/or A-8 would issue A-6, A-7 and/or A-8's stock in place of a cash dividend as more fully set forth hereinbefore.

79.     The contract is the Form S-3, as it set forth the terms of the purchase agreement and included a signature page.

80.     This was a bargained for exchange. The consideration for the contract was Plaintiff's and Class members' promise to accept A-6, A-7 and/or A-8 units instead of receiving their dividends in cash.

81.     A-6, A-7 and A-8, contracted with Plaintiff and the Class by offering to have A-6, A-7 and/or A-8 provide Plaintiff and Class members with an amount of A-6, A-7 and/or A-8 stock whose fair market value was equivalent to the dollar amount of the dividend declared and paid. Implied as part of the contract was the agreement and undertaking to use a fair and accurate value for the A-6, A-7 and/or A-8 stock to be paid to Plaintiff and Class members in lieu of the dividend.

82.     A-6, A-7 and A-8 also contractually undertook to utilize a fair and objective formula of calculations to determine fair market value for the DRIPS. This contractual undertaking was violated as demonstrated by Defendants' admission that the DRIP price was not based on any appraisal or valuation of the share prices.

83.     A-6, A-7 and A-8 breached their respective contracts by failing to change the price of units to be received in the DRIP when the arbitrary $11.00 per unit price was no longer indicative of the actual fair market value of the units, as required by the contract.

84. Plaintiff and Class members, by giving instructions to A-6, A-7 and/or A-8 to credit them with A-7 and/or A-8 stock in lieu of a cash dividend, fulfilled all their responsibilities to perform under the agreement.

85. A-6, A-7 and A-8 breached their agreement with Plaintiff and other Class members by setting the value of A-6, A-7 and/or A-8 stock and crediting them with A-6, A-7 and/or A-8 stock that was worth less than the dollar amount of the cash dividend declared and paid to non-electing A-6, A-7 and/or A-8 holders.

86. As a result of the breach, Plaintiff and members of the Class have been damaged in an amount representing the difference between the value of the dividend declared and paid, and the value of the A-6, A-7 and/or A-8 stock that they received.\

87. Plaintiff and class members also suffered further loss and damage when A-7, A-8 and A-9 were merged into AHR in February 2014. In that merger, A-7 shares were converted into AHR shares in a one to one exchange while A-8 shares were converted in AHR shares in a one to .85 exchange. Accordingly, as a result of Defendants' conduct, Plaintiff and Class members received fewer AHR shares. Currently, AHR trades at $20.34 per share and pays its shareholders $1.20 in dividends per year.

## COUNT II

### AGAINST ALL DEFENDANTS (EXCEPT A-6, A-7, A-8, BRE AND AHR) FOR TORTIOUS INTERFERENCE WITH CONTRACT AND TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

88. Plaintiff repeats and realleges each and every allegation of the Complaint as if more fully set forth herein.

89.     Plaintiff and members of the Class had a valid contract and/or business expectancy to receive A-6, A-7 and/or A-8 stock of equivalent value to the A-6, A-7 and/or A-8 dividend declared and paid during the Class Period.

90.     Plaintiff and the class had a reasonable and foreseeable expectancy that if they reinvested their cash dividends permit to the respective DRIP plans of A-6, A-7 and A-8, they would receive an amount of shares in return whose fair market value was equal to the amount of cash dividend declared and paid to Plaintiff and Class members who opted into the DRIP program.

91.     The "Interfering Defendants" (named in this Count) knew of Plaintiff's and Class members' contractual relationship with A-6, A-7 and A-8 and the reasonable expectancy that they (Plaintiff and the classes) would receive fairly valued Apple REIT stock through the DRIP program.

92.     The Interfering Defendants actions, as described herein constituted improper means and methods of interfering with Plaintiff and the Classes contracts with A-6, A-7 and A-8 and their reasonably expectancy arising therefrom.

93.     The Interfering Defendants actions, described herein constituted intentional interference which induced and/or caused a breach of the contract between Plaintiff and the classes and A-6, A-7 and A-8 respectively and caused a violation of Plaintiff and the Classes expectancy. Absent the Interfering Defendants actions, Plaintiff and the Classes would have realized the benefits of the contract.

94.     The aforesaid action caused loss and damage to Plaintiff and the Classes in two ways. First, Plaintiff and the Classes received fewer shares of A-6, A-7 and A-8 than they were entitled to receive in the DRIP program. Second, because Plaintiff and the Classes received

23

fewer shares of A-6, A-7 and A-8 in the DRIP, they later received less money in the A-6 buyout and with respect of the A-6, A-7 and A-8 merger they received fewer shares of the merged company which later were converted into shares of Apple Hospitality REIT.

95. The Interfering Defendants conduct was accompanied by actual malice or such recklessness or negligence to evince a conscious disregard for the rights of Plaintiff and Class members. There was never any lawful justification for the Interfering Defendants' conduct.

96. The interference alleged herein was also a violation of statutes and regulations of the United States as well as recognized common law rules.

97. To carry out the interference, the Defendants named in this Count used improper methods, including the making and mailing of false statements to A-6, A-7 and/or A-8 shareholders to induce them to accept A-6, A-7 and/or A-8 in lieu of the cash dividend declared and paid, filing materially misleading documents with the SEC, sending same to unit holders, and violating the Virginia Securities Act.

98. As a result thereof, Plaintiff and Class members have been damaged.

99. Plaintiff seeks damages for Defendants' conduct.

## COUNT III

### AS AND FOR A CLAIM AGAINST DEFENDANTS A-6, A-7, A-8, AHR AND BRE FOR BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

100. Plaintiff repeats and realleges each and every allegation of the Complaint as if more fully set forth herein.

101. The contract(s) which is (are) the subject of the claims herein was made in Virginia and the claims for breach thereof are governed by Virginia law.

102. In Virginia every contract contains an implied covenant of good faith and fair dealing.

24

103.     The contract between Plaintiff, Class members and A-6, A-7 and A-8 and AHR

contained in the Form S-3, previously described herein allowed A-6, A-7 and A-8 through their

respective boards, the discretion to determine the price at which the units would be sold to

Plaintiff and the Classes in the DRIP.

104.     The Forms S-3s explain the power of A-6, A-7 and A-8, through their respective

boards, to determine the pricing of the units sold in the DRIP to Plaintiff and the class members:

> . . . The Board of Directors may determine a different fair market
> value and price for our units for purposes of this plan if (1) good
> faith judgment of the board an amount of time has elapsed since
> our units have been purchased by unrelated persons such that the
> price paid by such person would not be indicative of the fair
> market value of our units, or (2) our Board determines there are
> other factors relevant to such fair market value.

105.     In maintaining an $11 per unit price throughout the existence of the DRIP

program, A-6, A-7 and A-8 breached the implied duty of good faith and fair dealing for the

reasons set forth herein by acting dishonestly, arbitrarily and unfairly towards Plaintiff and the

Class members.

106.     Neither A-6, A-7 and A-8 had an explicit contractual right to set the price per unit

at $11 per share for the DRIP program.  In the circumstances here, the implied duty of good faith

is particularly important in the context of the DRIP because during the Class Period, A-6, A-7

and A-8 were all non-publicly traded companies for which there was not stock exchange pricing

mechanism to act as an objective reference point for "fair market value."

107.     A-6, A-7 and A-8 also breached the implied covenant of good faith and fair

dealing under Virginia law by deceiving unit holders into believing that the last price at which an

unrelated party purchased a unit was related to actual fair market value.  A-6, A-7 and A-8

further breached the implied covenant by exercising their discretion unfairly and arbitrarily by

maintaining the $11.00 per unit cost of reinvestment when the actual fair market value of units was considerably less and also by exercising their discretion unfairly by failing to establish any procedures to re-evaluate the price of DRIP units.

## TOLLING OF STATUTE OF LIMITATIONS

108.    Plaintiff files each of the above claims within the statute of limitations.

109.    To the extent that the misconduct above occurred earlier, Plaintiff did not discover and did not have a reasonable opportunity to discover Defendants' misconduct because Defendants concealed their misconduct.

110.    It was not until the SEC's February 2014 Consent Order, which uncovered Defendants' countless transgressions, that Plaintiff discovered Defendants' violations of the above.

111.    The statutes of limitation on Plaintiff's claims are also tolled by the filing of other similar class action and shareholder derivative cases filed in this district and other districts against Defendants, alleging the same misconduct.

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative;

B.     Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

C.     Awarding damages to the Plaintiff and the Class from the Defendants on each of Counts II, II and III;

D.     Awarding Plaintiff and the Class punitive damages and the costs of this action, including reasonable allowance for Plaintiff's attorneys' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

Dated: February 24, 2017

SQUITIERI & FEARON, LLP

By:

Lee Squitieri
32 East 57th Street
12th Floor
New York, New York 10022
Tel:  (212) 421-6492
Fax:  (212) 421-6553

Of Counsel:

LAW OFFICES OF JOSEPH R. SANTOLI
340 Devon Court
Ridgewood, New Jersey 07450-1810
Tel:  (201) 926-9200
Fax:  (201) 444-0981

27