UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

MARSHA WILCHFORT *on behalf of herself
and all others similarly situated*,

                Plaintiff,

        v.

GLADE M. KNIGHT, APPLE REIT EIGHT,
INC., APPLE SIX ADVISORS, INC., APPLE
REIT SEVEN, INC., APPLE EIGHT
ADVISORS, INC. and APPLE FUND
MANAGEMENT, LLC, APPLE SEVEN
ADVISORS, INC., APPLE HOSPITALITY
REIT, INC., BRE SELECT HOTELS CORP.,
GLENN W. BUNTING, KENT W. COLTON,
LISA B. KERN, BRUCE MATSON, MICHAEL
S. WATERS and ROBERT M. WILEY,

                Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
17-CV-01046 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff Marsha Wilchfort commenced the above-captioned putative class action on

behalf of herself and all others similarly situated against, *inter alia*, Defendants Apple

Hospitality REIT, Inc., Apple REIT Seven, Inc., Apple REIT Eight, Inc. (collectively "AHR"),

and BRE Select Hotels Corp., as successor-in-interest to Apple REIT Six, Inc. ("BRE"),

asserting claims under Virginia law for breach of contract and the implied covenant of good faith

and fair dealing, and tortious interference with contract.  (Compl., Docket Entry No. 1.)

Defendants AHR and BRE separately move to dismiss the Complaint pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be

granted.[1]  (AHR Mot. to Dismiss ("AHR Mot."), Docket Entry No. 26; AHR Mem. in Supp. of AHR Mot. ("AHR Mem."), Docket Entry No. 26-1); BRE Mot. to Dismiss ("BRE Mot."), Docket Entry No. 28; BRE Mem. in Supp. of BRE Mot. ("BRE Mem."), Docket Entry No. 28-1.)  Defendants also move to dismiss the claims as time-barred.[2]  (AHR Mem. 16; BRE Mem. 8)  For the reasons explained below, the Court grants in part and denies in part Defendants' motions to dismiss.

## I.  Background

The facts alleged in the Complaint are assumed to be true for the purpose of deciding Defendants' motions.  Wilchfort, a resident of Sarasota County, Florida, was a shareholder of three separate real estate investment trusts (entities that own and operate income-producing real estate or "REITs"): Apple REITs Six, Seven, and Eight ("A-6," "A-7," and "A-8").  (Compl. ¶ 13; Civil Cover Sheet, annexed to Compl., Docket Entry No. 1-1.)

Beginning in 2006, 2007, and 2008, respectively, A-6, A-7, and A-8 each instituted a Dividend Reinvestment Program ("DRIP").  (Compl. ¶¶ 15–17, 49.)  Under DRIP, shareholders were "offered . . . the choice of receiving additional units in lieu of [cash] dividends."  (*Id.* ¶ 43.)

---

[1]  Plaintiff filed a consolidated opposition to Defendants' motions.  (*See* Pl. Opp'n to AHR Mot. and BRE Mot. ("Pl. Opp'n"), Docket Entry No. 32.)  Because of the factual and legal overlap, the Court consolidates Defendants' motions for purposes of this Memorandum and Order.

[2]  In her opposition to the motions to dismiss, Plaintiff voluntarily dismissed her claims for tortious interference with contract.  (Pl. Opp'n 2 n.2.)  Accordingly, Defendants Glade M. Knight, Lisa B. Kern, Bruce H. Matson, Michael S. Waters, Robert M. Wiley, Glenn W. Bunting, Kent W. Colton, (Compl. ¶¶ 18–21), and Apple Six Advisors, Inc., Apple Seven Advisors, Inc., Apple Eight Advisors, Inc., Apple Fund Management, LLC, (*id.* ¶¶ 22–26), are dismissed from the action.  (*See* Pl. Opp'n 2 n.2 (maintaining action only against Defendants AHR and BRE).)

The initial Forms S-3[3] provide the manner in which the shares are to be priced:

> The price of units purchased under the plan directly from us by dividend reinvestments will be based on the fair market value of our units as of the reinvestment date as determined in good faith by our board of directors from time to time.
>
> Our units are not publicly traded; consequently, there is no established public trading market for our units on which we could readily rely in determining fair market value. Nevertheless, the board has determined that, for purposes of this plan, at any given time the most recent price at which an unrelated person has purchased our units represents the fair market value of our units. Consequently, unless and until the board decides to use a different method for determining the fair market value of our units, the per unit price for the plan will be determined at all times based on the most recent price at which an unrelated person has purchased our units. Notwithstanding the foregoing, the board of directors may determine a different fair market value and price for our units for purposes of this plan if (1) in the good faith judgment of the board an amount of time has elapsed since our units have been purchased by unrelated persons such that the price paid by such persons would not be indicative of the fair market value of our units or (2) our board determines that there are other factors relevant to such fair market value.
>
> The most recent price paid by an unrelated person for a unit was $11.00 on July 25, 2007.[4] Accordingly, our board of directors has determined that the offering price for units purchased under the plan will initially be $11.00 per unit.

(Compl. ¶ 50; 2006 A-6 Form S-3, *available at* https://www.sec.gov/Archives/edgar/data/

1277151/000119311506026519/ds3d.htm; 2007 A-7 Form S-3, *available at* https://www.sec.gov/

Archives/edgar/data/1329011/000119311507156224/ds3d.htm; 2008 A-8 Form S-3,

---

[3] Form S-3 is a securities registration statement filed with the Securities Exchange Commission ("SEC"). *See Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017).

[4] The Forms S-3 include the same language other than the date as to the "most recent price paid by an unrelated person for a unit."

*available at* https://www.sec.gov/Archives/edgar/data/1387361/000119312508087581

/ds3d.htm.)[5] Therefore, in exchange for foregoing dividends, shareholders received shares at

"fair market value," a rate determined by one of two methods: (a) "the most recent price at which

an unrelated person had purchased [the] units" (b) or another measure determined in the good

faith judgment of the boards of directors.[6]  (Compl. ¶ 50; AHR Mem. 4.)  Thus, unless the boards

chose otherwise, shares were to be priced at the rate purchased by the last non-shareholder.

(Compl. ¶ 50.)  Throughout the entire alleged "Class Period," ranging from July 17, 2007

---

[5] The Court may take judicial notice of the relevant SEC filings. *See Moses v. Apple Hosp. REIT Inc.*, No. 14-CV-3131, 2016 WL 8711089, at *5 (E.D.N.Y. Sept. 30, 2016).  Rather than relying on the parties' excerpted portions of the Forms S-3, the Court relied on the publicly filed versions.  In addition, the Forms S-3 are incorporated by reference in the Complaint and integral to the Complaint. *See Wilson v. Kellogg Co.*, 628 F. App'x 59, 60 (2d Cir. 2016) (holding courts may consider documents "incorporated in the complaint by reference" in considering motions to dismiss); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (holding a court may consider a document "not [expressly] incorporated by reference . . . where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint").

[6] All parties involved made several seemingly contradictory statements in their briefing in their explanation of what the Forms S-3 state or require with regards to "fair market value" of the units.  (*See, e.g.*, AHR Mem. 3 ("The Apple REITS offered their investors the option of participating in a DRIP where investors could have their dividends reinvested in the Apple REITs through the purchase of additional shares. . . . [F]or purposes of the DRIP, the fair market value was determined to be the 'most recent price at which an unrelated person has purchased [the Apple REIT] units."); *cf. id.* at 4 ("Plaintiff alleges that the Apple REITs promised that DRIP participants would receive DRIP shares 'whose fair market value was equivalent to the dollar amount of the dividend declared and paid.' . . .  [T]his obligation is not reflected in the language of the alleged contract.").)  Based on all the briefing, the Court understands the main dispute to be over how the parties assess "fair market value."  Defendants argue that "fair market value" is the most recent price at which an unrelated person purchased the shares, and, as set forth in the Forms S-3, eleven dollars per unit.  Plaintiff counters that fair market value is either the last price purchased by an unrelated person — at a price lower than eleven dollars per unit — or some other price that reflects a more objective valuation of the shares.

through February 12, 2014,[7] (*id.* ¶¶ 1, 13), all three Apple REITs assessed fair market value at eleven dollars per share, "[t]he most recent price at which an unrelated person ha[d] purchased [the Apple REIT] units" according to Defendants' various public filings, (*id.* ¶¶ 42, 50).

Relying in part on a SEC Administrative Order imposing penalties on the Apple REITS for various violations of federal securities law,[8] Wilchfort alleges that Defendants were aware that the actual fair market value of their shares was well below eleven dollars. (*Id.* ¶¶ 10, 57, 59, 61, 71, 72.) Wilchfort further alleges that shares of A-7 and A-8 had been purchased by "unrelated persons . . . for much less than [eleven dollars] per share" in various tender offers. (*Id.* ¶¶ 66, 68.) In light of these circumstances, Wilchfort asserts that "Defendants failed to live up to their agreement to, in good faith, revalue units from time to time and to price units at 'the most recent price at which an unrelated person has purchased [the] units.'" (Pl. Opp'n to AHR Mot. and BRE Mot. ("Pl. Opp'n") 5, Docket Entry No. 32; Compl. ¶¶ 81–83, 105–07.)

## II. Discussion

### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d

---

[7] Although Plaintiff alleges the Class Period ranges from July 17, 2007 through February 12, 2014, she seeks to represent classes ranging only from July 17, 2007 through June 30, 2013. (Compl. ¶ 29.)

[8] Because of the lack of clarity on the propriety of considering SEC orders in subsequent litigation, the Court does not rely on the portions of the Complaint that cite or incorporate allegations from *In the Matter of Apple REIT Six Inc., et al.* Admin. Proc. No. 3–15750. *See Moses v. Apple Hosp. Reit Inc.*, No. 14-CV-3131, 2015 WL 1014327, at *2 (E.D.N.Y. Mar. 9, 2015) ("The Court declines to [consider the SEC order] as this action can be resolved on other, well settled grounds.").

Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

### b. Breach of contract

Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."[9] *Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 323 (2015) (citation omitted); *CoreTel Virginia, LLC v. Verizon Virginia, LLC*, 808 F.3d 978, 982–83 (4th Cir. 2015). The Court discusses each element below.[10]

---

[9] The parties agree that Virginia substantive law on breach of contract and the implied covenant of good faith and fair dealing applies. (*See* Pl. Opp'n 6; AHR Mem. 6; BRE Mem. 12); *see also Moses*, 2015 WL 1014327, at *4 ("The Court finds that Plaintiff's claim[] for . . . breach of contract . . . [is] governed by Virginia law . . . . The Forms S–3 contained a choice of law provision indicating that Virginia law governs.").

[10] The Court only discusses injury as to Defendant BRE because the AHR Defendants did not challenge the complaint on such basis. As discussed *infra*, the Court also did not need to

### i. Enforceable obligation

Plaintiff argues that the Forms S-3 provide enforceable obligations on which their contract claims are based.  (*See generally* Compl.)  Defendants do not argue that the Forms S-3 cannot form the basis of an enforceable obligation or contract.[11]  Indeed, Defendants do not dispute the holding in *Moses v. Apple Hospitality REIT Inc.*, No. 14-CV-3131, 2016 WL 8711089, at *6 (E.D.N.Y. Sept. 30, 2016), finding certain enforceable obligations in the Forms S-3.  Both Defendants acknowledge that at the very least, there was an enforceable obligation to price units at "the most recent price at which an unrelated person purchased [the] units."  *Id.*; (AHR Mem. 10; BRE Mem. 6–7.)  Defendants instead argue that Plaintiff is relying on theories or arguments not recognized by the *Moses* court.  Thus, the Court understands the dispute to be not whether the Forms S-3 give rise to *any* enforceable obligations but the scope and substance of those obligations.

---

reach the injury prong as to Defendant BRE because Plaintiff failed to adequately allege breach as to A-6.  However, the Court addresses Defendant BRE's argument as to injury to provide more clarity on the issue moving forward should Plaintiff amend her Complaint as to A-6.

[11]  "[A] legally enforceable obligation" or contract requires "an offer, acceptance, and valuable consideration."  *Dean v. Morris*, 287 Va. 531, 536 (2014) (citing *Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346 (1980)); *Kancor Americas, Inc. v. ATC Ingredients, Inc.*, No. 15-CV-00589, 2016 WL 740061, at *7 (E.D. Va. Feb. 25, 2016) (same).
The Complaint sets forth the required elements of a legally enforceable agreement.  Through their Forms S-3 and other public filings, Defendants "offer[ed] [their] Dividend Reinvestment Plans to . . . shareholders."  (2006 A-6 Form S-3; 2007 A-7 Form S-3; 2008 A-8 Form S-3; *see also* AHR Mem. 3 ("The Apple REITS *offered* their investors the option . . . .") (emphasis added).)  Plaintiff accepted the offers by participating in the DRIPs.  (Compl. ¶ 13.)  Plaintiff also provided valuable consideration by passing up the opportunity to receive dividends in exchange for more shares of A-6, A-7, and A-8.  (*Id.* ¶ 13, 80); *see also Moses*, 2015 WL 1014327, at *6 (finding Forms S-3 for A-7 and A-8 to constitute valid contracts regarding their respective DRIPs); *cf. Wenzel v. Knight*, No. 14-CV-432, 2015 WL 3466863, at *4 (E.D. Va. June 1, 2015) (assuming for the purposes of the opinion that Form S-3 for A-8 set out the requirements of an enforceable agreement).

### ii. Breach of enforceable obligation

Plaintiff asserts that Defendants breached the obligations provided in the Forms S-3 and other public filings in two ways: (1) "fail[ure] to reprice DRIP units following purchases by unrelated persons for prices far lower than $11.00," and (2) "fail[ure] to determine the fair market value and price of DRIP units from time-to-time in good faith." (Pl. Opp'n 6.)

"A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Virginia Elec. & Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645, 655 (4th Cir. 2017) (quoting *Horton v. Horton*, 254 Va. 111, 115 (1997).

### 1. Failure to reprice based on sales to unrelated persons

Plaintiff has sufficiently alleged a breach only as to A-7 and A-8 based on Defendants' failure to reprice DRIP units following purchases by unrelated persons. This theory of breach has already been addressed in *Moses*, 2016 WL 8711089, at *6. In *Moses*, the plaintiffs asserted the same breach of contract claims, as here, against A-7 and A-8. *Id.* As the *Moses* court explained, absent a contrary determination by the board of directors, the Forms S-3 expressly state that the fair market value is set at "the most recent price at which an unrelated person has purchased [the] units." *Id.*; (Compl. ¶ 50.) Further, the Forms S-3 explain that eleven dollars per share is the last price at which an unrelated person purchased the shares.[12] *Moses*, 2016 WL

---

[12] Defendant BRE argues in its reply that the Form S-3 for A-6 cannot be read to require pricing of units "based on outside transactions to which it was not a party." (BRE Reply in Supp. of BRE Mot. ("BRE Reply") 6 & n.3, Docket Entry No. 35.) However, the Forms S-3 do not expressly provide that the price is contingent on sales directly from Defendant BRE. There is no limiting language that the price cannot also be adjusted based on purchases of units from third parties. This ambiguity raises an issue of fact that cannot be resolved at the motion to dismiss stage. *See Moses v. Apple Hosp. REIT Inc.*, No. 14-CV-3131, 2016 WL 8711089, at *6 (E.D.N.Y. Sept. 30, 2016) (reaching same conclusion in response to same arguments made for pricing of A-7 and A-8 units).

8711089, at *6; (Compl. ¶ 50.)  In light of this language in the Forms S-3, the *Moses* court determined that the plaintiffs had sufficiently alleged a breach of contract based on the allegation that the defendant continued to value the units at eleven dollars per share despite sales to unrelated parties at lower prices.  *Id.* at *6.  Here, Plaintiff likewise alleges that Defendants failed to reprice A-7 and A-8 shares despite successful cash tender offers to unrelated parties at prices below eleven dollars per share.  (*Id.* ¶¶ 66–69.)  However, Plaintiff fails to allege in the Complaint any similar sales to unrelated parties of A-6 shares.  Accordingly, Plaintiff has sufficiently alleged a breach of contract under this theory as to A-7 and A-8 but not A-6.[13]

AHR Defendants attempt to distinguish Plaintiff's claims from those in *Moses* by arguing that the Complaint's references to tender offers of A-7 and A-8 shares are only "offered as support" for the allegation that eleven dollars per share was not reflective of fair market value. (AHR Mem. 10.)  In other words, AHR Defendants assert that Plaintiff does not allege claims for breach of contract for failure to reprice the shares following tender offers of units at prices lower than eleven dollars per unit.  Defendants contend that this "construction" of the Complaint is "consistent" with the asserted class period commencing July 17, 2007, "rather than on the dates of the tender offers, [which occurred] years later."  (*Id.*)

The Court disagrees with AHR Defendants' construction of Plaintiff's claims as to this theory of breach.  Although the Complaint is not entirely clear, the section on breach of contract

---

[13]  Plaintiff alleges for the first time in her opposition brief that A-6 shares were also sold to unrelated persons at less than eleven dollars per unit.  (*See* Pl. Opp'n 7–8.)  However, Plaintiff may not amend her Complaint through an opposition to a motion to dismiss.  *See Moses*, 2016 WL 8711089, at *7 ("Plaintiff may not amend the Complaint through her opposition brief by asking the Court to read something into the Complaint that was not alleged."); *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005) ("It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs."), *aff'd,* 157 F. App'x 398 (2d Cir. 2005).

does incorporate earlier allegations that encompass the theories of breach as clarified in the opposition submission. For example, the Complaint states that "[a]s part of the contract, A-6, A-7, and A-8 agreed to value the units at 'fair market value' deemed to be the last arms-length transaction in the units and *further* agreed to re-evaluate the worth of the units in good faith and adjust same to be equal to fair market value." (Compl. ¶ 2 (emphasis added).) The Complaint also separately notes the failure of A-7 and A-8 to reprice the shares after the tender offers. (*Id.* ¶¶ 66–69.) Moreover, even the allegation in paragraph eighty-three of the Complaint, on which AHR Defendants rely, can be read to support either theory of liability. The allegation explains that Defendants breached their contracts "by failing to change the price of units . . . when the arbitrary [eleven dollars] per unit price was no longer indicative of the actual fair market value of the units, *as required by the contracts*." (*Id.* ¶ 83 (emphasis added).) Even under this theory of breach, eleven dollars per unit could be considered "arbitrary" and "no longer indicative of actual fair market value" because of a failure to reprice "as required by the contracts" following the tender offers. Read as a whole, the Complaint sufficiently states a claim for breach of contract based on a failure to reprice the shares after the tender offers to unrelated persons.[14]

2. **Failure to determine fair market value from time to time**

Plaintiff's second theory of breach as to all Defendants is without merit. Under this theory, Plaintiff asserts that Defendants were *expressly required* to revalue the shares in good

---

[14] The internal inconsistences in the Complaint more generally may be explained by the two separate theories of liability as well as the claim for breach of the implied covenant of good faith and fair dealing. In any event, Plaintiff may advance alternative theories of liability. *See Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49, 55 n.3 (2d Cir. 2004) ("Federal Rule of Civil Procedure 8(e)(2) permits pleading inconsistent theories in the alternative.").

faith from "time to time." (Pl. Opp'n 10.) This argument has already been raised and rejected in *Wenzel v. Knight*, No. 14-CV-432, 2015 WL 3466863, at *4 (E.D. Va. June 1, 2015), addressing claims against A-7[15] and A-8. Raising the same breach of contract claims, as in this action, the plaintiff in *Wenzel* "argue[d] that the agreement required the defendants to price the DRIP shares according to fair market value *and reassess and alter the DRIP share price on a regular basis.*" *Id.* at *7 (emphasis added). The *Wenzel* court rejected *both* arguments because, "[r]eading the entire contractual language together," they "ignore[d] what the agreement[s] say[]."[16] *Id.*; *see also Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 384 (1997) ("A contract must be construed as written and as a whole with all parts being harmonized whenever possible."). In dismissing the breach of contract claim, the *Wenzel* court explained that "[t]he agreement imposed no duty on the board to monitor, evaluate, or appraise the share values." *Wenzel*, 2015 WL 3466863, at *7. Instead, the Form S-3 only conferred "*discretionary* power" to the board, and the board's refusal to exercise that power could not form the basis of a breach of contract claim. *Id.*

The Court agrees with the reasoning in *Wenzel* and finds no enforceable obligations to revalue the shares from time to time. *See id.* Instead, reading the entire language in the Forms S-3 together, the contracts conferred *discretionary* power to the boards to reconsider the fair market value of the shares through valuation methods different from the "most recent price at

---

[15] In *Wenzel*, the court dismissed the A-7 claims because the named plaintiff lacked standing to sue on behalf of the A-7 shareholders. *Wenzel*, 2015 WL 3466863, at *1.

[16] Despite not directly addressing this latter theory, the *Moses* court appeared to agree with the reasoning in *Wenzel*. In citing to the Forms S-3 language on pricing, the *Moses* court specifically added emphasis to the permissive language, including "may," in the section. *See Moses*, 2016 WL 8711089, at *5; *see also Ross v. Craw*, 231 Va. 206, 212 (1986) ("As we have noted in the past, . . . the word 'may' is primarily permissive.").

which an unrelated person has purchased [the] units." *See id.*

Plaintiff attempts to distinguish *Wenzel* by asserting that dismissal in that action was premised on a theory that "was not grounded in any contractual language or factual statements made by the defendants." (Pl. Opp'n 10.) Plaintiff asserts that the theory asserted in *Wenzel* was "that the [eleven dollars per share] price was . . . based on the underlying value of the assets in the real estate investment trust." (*Id.*) By contrast, Plaintiff alleges that her claims are not only based on the failure of the units to "accurately reflect fair market value" but also Defendants' "abdicat[ion] [of] their contractual duty to determine the fair market value of units offered under the DRIP in good faith." (*Id.*) Under this latter "new" theory, Defendants are allegedly required to reassess fair market value in good faith from time to time. (*Id.*)

The Court finds Plaintiff's attempt to distinguish the holding in *Wenzel* unpersuasive. As discussed above, the *Wenzel* court rejected *both* theories of breach, including this "new" theory of liability. While Plaintiff in this action has worded her claims slightly differently from those presented in *Wenzel*, both actions articulate fundamentally the same theories of liability.[17] The Court is also aware that *Wenzel* and this action not only share the same claims and theories of liability but also the same counsel.[18] Attempts to manufacture multiple bites at the same apple

---

[17] To the extent Plaintiff argues that the reasoning in *Wenzel* only considered the language in the second and not the first paragraph in the section titled "How are unit prices determined?" in the Forms S-3, the Court notes that the *Wenzel* court emphasized that it contemplated the contractual language as a whole. *See Wenzel*, 2015 WL 3466863, at *7 ("Reading the entire contractual language together . . . ."). The *Wenzel* court also included the entirety of the relevant Form S-3 section in its discussion. In addition, the *Moses* court appears to have reached the same conclusion despite not articulating as much. *Id.* at *6–7; (*supra* p. 11 n.15.)

[18] The Court finds different portions of both *Moses* and *Wendel* persuasive even if non-binding.

will not be rewarded.  *See also Pharr v. Evergreen Garden, Inc.*, 123 F. App'x 420, 424 (2d Cir. 2005) (explaining that on the issue of privity for *res judicata*, fact that plaintiffs in related actions were represented by the "same attorney" was of "singular significance"); *Sondel v. Nw. Airlines, Inc.*, 56 F.3d 934, 940 (8th Cir. 1995) (recognizing that "res judicata is designed to prevent . . . successive litigation [seeking to circumvent earlier adverse judgments in other courts] that allows second bites at the apple").[19]

The Court finds that Plaintiff has sufficiently pled breach of obligations to price the shares at fair market value, defined as the most recent price an unrelated person has purchased Defendants' units, as to A-7 and A-8 but not A-6.  (*See* Compl. ¶¶ 2, 66–69.)  Plaintiff has sufficiently pled a failure to re-price A-7 and A-8, but not A-6, following tender offers of units at less than eleven dollars per unit.  Accordingly, Plaintiff has sufficiently alleged breach of contract claims against Defendants AHR but not BRE.

### iii. Injury

Defendant BRE argues that the claims as to A-6 also fail for lack of injury.[20]  In 2012, as part of a merger agreement, outstanding A-6 shares were converted at eleven dollars and ten cents per unit.  Accordingly, Defendant BRE asserts that Plaintiff received "ten cents more than the value she pleads was too high" and thus suffered no damages.  (BRE Mem. 5; 2012 A-6 Form 10-K, annexed to BRE Mot. as Ex. B, Docket Entry No. 28-4.)  Plaintiff asserts that she suffered damages in the form of "fewer shares" received given the alleged overvaluation of the DRIP shares.  (Pl. Opp'n 12 (citing Compl. ¶ 86).)

---

[19]  The Court does not rely on the doctrine of *res judicata* in this decision.  The citations to decisions discussing *res judicata* principles above merely highlight that the theories of liability in *Wenzel* and this action, brought by the same attorney, are fundamentally the same.

[20]  AHR Defendants did not make a similar argument as to A-7 and A-8 units.

Under Virginia law, "[t]he general rule is that damages are to be determined at the time of breach of a contract." *United Virginia Bank of Fairfax v. Dick Herriman Ford, Inc.*, 215 Va. 373, 375 (1974) (citation omitted). "Evidence of fluctuations in value after the breach is irrelevant." *Id.* (first citing *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971); and then citing *Gaylord Builders v. Richmond Metal Mfg. Co.*, 186 Pa. Super. 101 (1958)).

Here, the alleged injury is that Plaintiff received DRIP units that were not equivalent in value to the dividends for which they were exchanged. (*See* Compl. ¶ 86.) Under Virginia law, Plaintiff is entitled to damages equal to the difference between the dividends she exchanged and the value of the units at the price they should have been priced at the time of breach. *See United Virginia Bank of Fairfax*, 215 Va. at 375; *see also Simon*, 28 N.Y.2d at 145 ("The rule is precisely the same when the breach of contract is nondelivery of shares of stock." (citation omitted)). Because commodities are expected to fluctuate in value, Plaintiff, in fact, likely has the stronger argument that she, rather than Defendant BRE, should benefit from any rise in value of A-6 shares.[21] In certain breach of contract cases involving securities, courts have credited positive fluctuations in price of shares against the breaching party under the rationale that the non-breaching party stood to benefit but for the breach. *See, e.g., Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 609 (S.D.N.Y. 1977) (recognizing delay damages for delayed delivery of securities). Regardless, Plaintiff has sufficiently alleged injury under the traditional measure of damages recognized under Virginia law. Nevertheless, as discussed above, Plaintiff fails to state a contract claim as to Defendant BRE because she has not alleged any failure to re-price the A-6 units following a tender offer for less than eleven dollars per unit.

---

[21] For instance, if the injury is conceptualized as non-delivery of an appropriate number of shares, Plaintiff may potentially be entitled to the value of such shares at the time of sale.

### c. Breach of the implied covenant of good faith and fair dealing

Plaintiff's allegations are not clear as to the theories of breach of the implied covenant of good faith and fair dealing. Plaintiff appears to assert the following bases for liability: (1) Defendants were dishonest in failing to price the units at actual fair market value,[22] including the failure to reprice upon sales to unrelated persons, (Compl. ¶¶ 105, 107); (2) Defendants acted arbitrarily and unfairly by declining to amend the price of the shares solely for their benefit, despite knowledge of overvaluation, (*id.*); and (3) Defendants acted arbitrarily and unfairly "by failing to establish any procedures to re-evaluate the price of the DRIP unit," (*id.* ¶ 107).

Defendants contend that the good faith claim fails for three reasons: (1) Virginia law only recognizes such causes of action under the Uniform Commercial Code ("UCC"); (2) even under the UCC, good faith claims give rise to a breach of contract, not an independent, stand-alone cause of action; and (3) the allegations are duplicative of the contract claims or any implied duties cannot contradict express contractual terms. (AHR Mem. 2, 15–16; BRE Mem. 18–20.)

"Under Virginia law, 'every contract contains an implied covenant of good faith and fair dealing; however, a breach of those duties only gives rise to a breach of contract claim, not a separate cause of action.'" *Moses*, 2016 WL 8711089, at *7 (citing *Frank Brunckhorst CO., LLC v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 462 (E.D. Va. 2008)); *see also Stoney Glen, LLC v. S. Bank & Tr. Co.*, 944 F. Supp. 2d 460, 465 (E.D. Va. 2013) ("[T]he Fourth Circuit has consistently held that Virginia does recognize an implied duty of good faith and fair dealing in common law contracts."). Thus, a "breach of the implied duty of good faith and fair dealing must be raised in a claim for breach of contract, as opposed to a claim in tort." *Moses*, 2016 WL 8711089, at *7

---

[22] This theory is without merit to the extent it is another attempt to allege that Defendants were required to revalue the DRIP shares by a method different from the last price paid to an unrelated person for the reasons set forth above.

(citing *Stoney Glen*, 944 F. Supp. 2d at 465). In addition to a contractual relationship, a viable claim requires a breach of the implied covenant that can be demonstrated in two ways: "(1) where a party has a clear contract right, even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly, (2) but where a party has discretion in performance, that party cannot act arbitrarily or unfairly." *Id.* (citations omitted).

The Court finds unviable two of Plaintiff's theories of breach of the implied covenant of good faith and fair dealing: (1) that Defendants dishonestly failed to price the units at fair market value and (2) that Defendants failed to establish any re-evaluation procedures. The first theory effectively duplicates the arguments made in support of Plaintiff's breach of contract claim. As discussed *supra*, the Complaint sets forth sufficient allegations of breach of contract claims arising out of a failure to reprice the units upon sales to unrelated persons. Thus, the Court finds it unnecessary and duplicative to determine whether the failure to reprice can be characterized as "dishonest." *See Rogers v. Deane*, 992 F. Supp. 2d 621, 633 (E.D. Va. 2014) ("Where there is a claim for breach of contract, the inclusion of a claim for breach of the implied covenant of good faith and fair dealing as a separate claim is duplicative of the breach of contract claim; it does not provide an independent cause of action." (citation omitted)), *aff'd*, 594 F. App'x 768 (4th Cir. 2014). Similarly, the Court has already effectively considered in the breach of contract discussion whether Defendants have an obligation to periodically reevaluate the unit pricing process. To be viable, this theory requires an affirmative obligation to reassess the price or methods of valuation from "time to time" — an argument unsupported by the Forms S-3. (*See supra* pp. 8–10.) Defendants cannot be said to have acted in bad faith for failing to establish

procedures for an obligation that does not exist.[23]  *Wenzel*, 2015 WL 3466863, at *7.

However, the Plaintiff sufficiently alleges a breach of the implied covenant of good faith and fair dealing under the theory that Defendants declined to re-price the shares, despite knowledge of their overvaluation, solely out of self-interest.  (Compl. ¶¶ 105, 107.)  Under the Forms S-3, Defendant had the initial contractual right to price the shares at eleven dollars per unit, based on the last sale to an unrelated person, while retaining sole contractual discretion to reassess the price and methods of valuation.  Consistent with this understanding, Defendants are not liable for breach of contract for merely declining to exercise such discretion.  (*See supra* pp. 8–10.)  However, Defendants may be liable for breach of the implied covenant of good faith and fair dealing if their refusal to do so was arbitrary or unfair.  *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Connecticut*, 156 F.3d 535, 542 (4th Cir. 1998) ("[I]t is a basic principle of contract law in Virginia, as elsewhere, that . . .  a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party.").

As at least one court has acknowledged, "Virginia law on the implied duty of good faith and fair dealing is not exceptionally clear."  *Stoney Glen, LLC v. S. Bank & Tr. Co.*, 944 F. Supp. 2d 460, 465 (E.D. Va. 2013).  Nevertheless, the facts and reasoning in *Virginia Vermiculite*, 156 F.3d at 535, appear to squarely address this issue.  In *Virginia Vermiculite*, a family contracted with a mining company for mining rights to their land in exchange for a lump sum and royalties of the amount of mine produced.  *Virginia Vermiculite*, 156 F.3d at 537–38.  Under the contract, the company had "sole discretion" whether to mine the land.  *Id.* at 541.  Despite such discretion, the Fourth Circuit held that donating the land to a trust, so that it could never be mined for the

---

[23]  At best, the lack of reevaluation procedures is an outgrowth or evidence for an argument that Defendants acted arbitrarily and unfairly in declining to amend the price solely for their benefit.

purpose of frustrating a competitor, breached a duty of good faith owed to the family.

*Id.* at 542. The court also explained that the "implied duty of good faith is particularly important in the context of mining leases, where the landowners must necessarily leave the decisionmaking process to the expertise of mining companies." *Id.* (quoting *Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, 1993 WL 13029827, at *3 (1993)).

As in *Virginia Vermiculite*, Defendants retained the "sole discretion" to act or not act to reassess the price of units, impacting the benefits conferred to the other party to the contract. In addition, in both cases, defendants refused to exercise such discretion. Moreover, defendants in both cases allegedly declined to exercise such discretion purely out of self-interest, without consideration of the interests and welfare of the other parties to the contract, working effectively to directly injure the interests of the other parties.[24] (*See* Compl. ¶¶ 10, 38 59–64); *Virginia Vermiculite*, 156 F.3d at 542; *see also Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, 1993 WL 13029827, at *4 (1993) ("[A]lthough Clause 12(E) indicates that [the mining company] expressly disclaimed any legal obligation to mine Parcel A under any circumstances,

---

[24] The *Moses* and *Wenzel* courts did not expressly consider the claims for breach of the implied covenant of good faith and fair dealing. The *Moses* court dismissed the claim for breach of the implied duty of good faith because the allegations in the complaint included only a "few passing references" and conclusory assertions of breach. *Moses*, 2016 WL 8711089, at *7. The *Wenzell* did not address the claim for breach of the implied covenant of good faith and fair dealing because the plaintiff first raised the claim in her opposition to motion to dismiss. *Wenzel*, 2015 WL 3466863, at *7 n.6. In addition, the *Wenzel* court explained that had it entertained such a claim, it would have likely dismissed the claim because plaintiff's argument that defendants failed to "amend the price" effectively would "recast the board's discretion to change DRIP pricing as an obligation to do so." *Id.* However, the *Wenzel* court did not appear to have considered *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Connecticut*, 156 F.3d 535, 542 (4th Cir. 1998). Furthermore, as discussed *supra*, Defendants could decline to exercise their discretion not to reprice shares for any number of reasons, so long as they did not do so in bad faith.

such a disclaimer would have been ineffective to the extent that a refusal to mine would have constituted bad faith on [the mining company's] part."). While entitled to decline to reassess the price or valuation methods for a myriad of reasons, even if potentially harmful to the interests of Plaintiff, Defendants could not do so in bad faith.

Here, Plaintiff asserts that Defendant declined to exercise their discretion,[25] despite knowledge of a lower valuation, *solely* for self-benefit. In support of this argument, Plaintiff alleges in the Complaint that Defendants had knowledge of the lower valuation, (*see* Compl. ¶¶ 59–64), and Defendants' financial difficulties as a potential motive to act in bad faith, (*see id.* ¶¶ 10, 38). Under these circumstances, Plaintiff has sufficiently alleged breach of the implied covenant of good faith and fair dealing. Indeed, the implied covenant may be particularly important, in circumstances as here, where plaintiffs must "necessarily leave the decisionmaking process to the expertise" of defendants with specialized knowledge in a relevant field.[26] *Virginia*

---

[25] Defendants effectively argue that the duty of good faith can only be violated where there is an affirmative obligation to act. (*See* AHR Mem. 16 ("Even if [the duty of good faith] were a viable stand-alone claim . . . the board was not *obligated to* [*revisit the price*]").) The Court does not find a meaningful distinction between the exercise of discretion leading to action as compared to inaction. Either can be employed in bad faith depending on the circumstances. *See Indep. Fed. Sav. Bank v. Briley*, No. 08-CV-1189, 2009 WL 3498110, at *3 (E.D. Va. Oct. 27, 2009) ("But the obligation goes further: bad faith may be overt or may consist of inaction . . . ." (citing Restatement (Second) of Contracts § 205 cmt. d (1981))), *aff'd*, 393 F. App'x 66 (4th Cir. 2010); *see also 1st Stop Health Servs., Inc. v. Dep't of Med. Assistance Servs.*, 63 Va. App. 266, 280 (2014) ("Our Supreme Court often has cited the Second Restatement [of Contracts] as authoritative" (citing *Horton v. Horton,* 254 Va. 111, 116 (1997)).

[26] As Defendants are aware, a party's discretion cannot be unfettered. In disputing that the price of the shares can be based on sales to third parties, Defendant BRE asserts that such an interpretation of the Forms S-3 would allow "a DRIP participant [to] generate a windfall simply by selling a single unit for $1.00." (BRE Reply 6 n.3.) Defendants' argument requires the assumption that DRIP participants, as parties to the contract, have unfettered discretion to sell their shares at any price, including for the sole-purpose of "generat[ing] a windfall." (*Id.*) However, DRIP participants are also bound by the implied covenant of good faith and cannot exercise *their* discretion in bad faith.

*Vermiculite*, 156 F.3d at 542. Accordingly, Plaintiff has sufficiently alleged a breach of the implied covenant as to all Defendants.[27]

### d. Statute of limitations

Defendants argue in their motions to dismiss that, absent some form of tolling, Plaintiff's claims in their entirety are barred by the applicable statutes of limitations. (*See* AHR Mem. 18, 20; BRE Mem. 9, 10.) AHR Defendants assert that Plaintiffs' claims accrued either when (1) the value of the DRIP units were set in 2007 or 2008 or (2) when the DRIP unit value prices were no longer indicative of fair market value — a time period ranging between late 2008 to 2011. (AHR Mem. 18.) Defendant BRE asserts that Plaintiff's claims as to BRE accrued on May 14, 2009, when the 2006 A-3 Form S expired through amendment. Plaintiff contends that A-6, A-7, and A-8 DRIPs are best understood as divisible contracts, with a new breach occurring at each dividend distribution date. Therefore, accrual began anew and separately for each breach. (Pl. Opp'n 16.) Plaintiff argues that, as a result, the statute of limitations does not bar claims based on dividend reinstatements made after February 24, 2012 — five years prior to the filing of this action. (*Id.* at 19.)

In diversity actions, "a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998). Generally, New York courts apply New York's statute of limitations, subject to the traditional statutory exception provided in the New York Civil Practice Law and Rules ("CPLR") § 202. *Id.* at 627. "Under CPLR § 202, when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations

---

[27] The Court notes that Virginia law on contracts and the implied duty of good faith and fair dealing would appear to preclude double recovery. *See Rogers v. Deane*, 992 F. Supp. 2d 621, 633 (E.D. Va. 2014).

period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Id.* (citation omitted). "Hence, an action by a nonresident on a foreign cause of action is untimely if it is barred under the law of either New York or the state where the injury occurred." *Id.* "New York law locates the cause of action for breach of contract causing financial harm at 'the place of injury,' which 'usually is where the plaintiff resides and sustains the economic impact of the loss.'" *Muto v. CBS Corp.*, 668 F.3d 53, 60 (2d Cir. 2012) (citation omitted).

Under New York law, Plaintiff's claims accrued in Florida where she resides and sustained economic injury. *See Muto*, 668 F.3d at 60. Therefore, the shorter of either Florida's or New York's statute of limitations applies. Florida imposes a five-year limitations period for breach of contract actions.[28] Fla. Stat. § 95.11(2)(b). By contrast, New York enforces a six-year limitations period. CPLR § 213(2). Thus, Florida's shorter five-year period applies. *See Stuart*, 158 F.3d at 626.

---

[28] Defendant BRE, citing to Florida Statutes § 95.11(3)(k), argues that a four-year period applies to the claim for breach of the implied covenant of good faith and fair dealing. Florida Statutes § 95.11(3)(k), however, applies to actions "not founded on a written instrument." *Cf. Mursten v. Caporella*, No. 14-CV-60014, 2015 WL 12824370, at *2 (S.D. Fla. Feb. 9, 2015) ("[Plaintiff's] characterization of his claim as one for breach of an *oral* agreement, and thus subject to a four-year statute of limitations." (emphasis added)). In contrast, Plaintiff's claim for breach of the implied covenant is based on the Forms S-3 and other public filings — written instruments creating contractual relationships, and is therefore subject to a five-year statute of limitation. *See Brown v. Nationscredit Fin. Servs. Corp.*, 32 So. 3d 661, 662 n.1 (Fla. Dist. Ct. App. 2010) ("The breach of the duties of good faith and fair dealing is a claim arising from the parties' contractual relationship and, therefore, subject to a five-year statute of limitations under section 95.11(2)(b)."); *Potiker v. Gasiunasen Gallery*, No. 09-CV-82356, 2010 WL 2949943, at *1 (S.D. Fla. July 26, 2010) ("The statute of limitations on [Plaintiff's] claims for breach of contract, breach of express warranty, and breach of the [implied] covenant of good faith and fair dealing is five years" (citing Fla. Stat. § 95.11(2)(b))). Therefore, as acknowledged by AHR Defendants, the Florida Statutes § 95.11(2)(b) and its five-year period applies to the claims for breach of the implied covenant of good faith and fair dealing.

### i.   The Forms S-3 are divisible contracts

Contract claims accrue at the time of breach.  *See Tech. Packaging, Inc. v. Hanchett*, 992

So. 2d 309, 313 (Fla. Dist. Ct. App. 2008); *see also Barbara G. Banks, P.A. v. Thomas D. Lardin,*

*P.A.*, 938 So. 2d 571, 574 (Fla. Dist. Ct. App. 2006) ("A cause of action on a contract accrues

upon breach of the contract.").   "Where a contract is divisible, 'breaches of its severable parts

give rise to separate causes of action,' and 'the statute of limitations will generally begin to run at

the time of each breach.'"  *Access Ins. Planners, Inc. v. Gee*, 175 So. 3d 921, 924 (Fla. Dist. Ct.

App. 2015) (citation omitted); 15 Williston on Contracts § 45:20 (4th ed.) ("A contract is

divisible where it calls for payments or performance at specific, separate intervals."); *see also*

*Legard v. EQT Prod. Co.*, No. 10-CV-00041, 2011 WL 86598, at *7 (W.D. Va. Jan. 11, 2011)

("Under Virginia law, a contract which calls for payments or performance at specific intervals is

a divisible 'installment' contract."), *report and recommendation adopted*, No. 10-CV-00041,

2011 WL 4527784 (W.D. Va. Sept. 28, 2011); *Hampton Roads Sanitation Dist. v. McDonnell*,

234 Va. 235, 239 (1987) ("[W]hen wrongful acts are not continuous but occur only at intervals,

each occurrence inflicts a new injury and gives rise to a new and separate cause of action.");

*Access Ins. Planners*, 175 So. 3d at 924 (finding "a continuing contract . . . contemplat[ing]

performance and payments upon the occurrence of separate, distinct events" to be a divisible

contract).

Under either Virginia or Florida law, the Forms S-3 are best viewed as divisible contracts,

giving rise to a separate breach each time dividends were exchanged for an inadequate number of

shares.[29]  Each exchange of dividends for shares occurs and is completed independently from the

---

[29]   While tolling is clearly dictated by Florida law, it is unclear whether the nature of the
contracts should be determined under Virginia or Florida substantive law.  The Court need not

others.  Thus, the statute of limitations accrues separately for each exchange or breach.  As a

result, because this action was filed on February 24, 2017, Plaintiff's claims based on the

exchange of dividends for units that occurred after February 24, 2012 — five years prior to filing

— are not time-barred.[30]

### ii.  Equitable tolling

Plaintiff argues that her breach of contract claim as to A-7 was tolled by the *Moses* action.

Plaintiff relies on *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974), and its

---

decide this issue as Florida and Virginia appear to use essentially the same standard in
determining whether a contract is divisible.  *See Hampton Roads Sanitation Dist. v. McDonnell*,
234 Va. 235, 239 (1987) ("[W]hen wrongful acts are not continuous but occur only at intervals,
each occurrence inflicts a new injury and gives rise to a new and separate cause of action.");
*Access Ins. Planners, Inc. v. Gee*, 175 So. 3d 921, 924 (Fla. Dist. Ct. App. 2015) (finding "a
continuing contract . . . contemplat[ing] performance and payments upon the occurrence of
separate, distinct events" to be a divisible contract).

[30]  Defendant BRE also argues that Plaintiff cannot assert claims for any breach occurring
after February 24, 2012 because the only contract she relies on for A-6 is the 2006 Form S-3.
(*See* BRE Mem 9; BRE Reply 2.)  Defendant BRE argues that any exchange in dividends for
shares pursuant to the 2006 Form S-3 would have occurred years before 2012 and would be
time-barred.  However, while not clearly written, the Complaint asserts claims based on Forms
S-3 promulgated during the "relevant [class] period," including the amended 2009 version.  (*See*
Compl. ¶ 48.)  In addition, paragraph 48, on which Defendant BRE relies, qualifies the list
therein as non-exhaustive through the term "include[s]."  (*Id.* ¶ 49.)  Further, other parts of the
Complaint clarify Plaintiff's reliance on the amended 2009 Form S-3.  (*See, e.g.*, *id.* ¶ 17 ("[A-
6], at all times relevant herein . . . was subject to the reporting requirements of Section 13(a) of
the Exchange Act . . . A-6 instituted a DRIP by filing a Form S-3 registration statement on
February 10, 2006, which it amended and restated on May 14, 2009."); *id.* ¶ 29 ("All persons and
entities that elected to participate in the A-6 DRIP from July 17, 2007 through December
2012."); *id.* ¶ 29(f) ("A6 . . . Annual Reports on Form 10-K for the annual periods ended
December 31, 2008, 2009, 2010, 2011, and 2012."); *id.* ¶ 54 ("Despite the representation in the
Forms S-3 issued during the Class Period . . . .").)  The Court finds that the allegations in the
Complaint state claims for breach pursuant to the A-6 2006 Form S-3 and the amended and
restated 2009 version.  However, as discussed *supra*, Plaintiff has failed to adequately assert
claims for breach of contract as to A-6.  Accordingly, as currently alleged in the Complaint, this
discussion on tolling is only applicable to the breach of the implied covenant of good faith claim
as to Defendant BRE.

progeny, which have held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who could have been parties had the suit been permitted to continue as a class."[31]  Plaintiff also argues that Florida state courts, applying Florida law, have applied *American Pipe*.  (Pl. Opp'n 20–21.)  Plaintiff concedes that, absent any tolling, all her claims, including those based on A-7, are limited to the period after February 24, 2012 under Florida law.  (*Id.* at 19.)  Defendants contend that the Second Circuit has limited the "extraterritorial" or cross-jurisdictional application of *American Pipe*, preferring to defer to state authority as to whether to allow "equitable tolling of a state statute of limitations due to the pendency of a putative class action *in another jurisdiction*."  (AHR Reply in Supp. of AHR Mot. ("AHR Reply") 5, Docket Entry No. 34.)  Defendants also argue that the Florida State Supreme Court has only allowed individual claims to proceed following a previously filed class action.  (*Id.*)

In diversity actions, the Second Circuit evaluates the timeliness of state law claims by looking to the law of the relevant state, including state tolling rules.  *Vincent v. Money Store*, 915 F. Supp. 2d 553, 560–61 (S.D.N.Y. 2013) (citing *Casey v. Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011).  Therefore, Plaintiff cannot rely on *American Pipe* but "must look to [a] state analogue."[32]

---

[31]  Plaintiff bases her argument on the theory that the plaintiff in *Moses* did not have class standing for A-7 claims.  (Pl. Opp'n 24.)  As discussed *infra*, the Court does not address this aspect of Plaintiff's argument because of the finding that Florida does not allow cross-jurisdictional equitable tolling.  The Court notes, however, that the *Moses* court deferred ruling on whether the named plaintiff in that action had class standing for A-7 claims.  *See Moses*, 2016 WL 8711089, at *4 ("Defendant's argument that Plaintiff lacks standing to represent individuals who participated in A7's DRIP is . . . premature and should be addressed at the class certification stage." (citation omitted)).

[32]  State courts are of course free to create their own rules based on the reasoning of *American Pipe*, including through adoption of federal case law.  *See, e.g.*, *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1122 (1988).

*Id.*; *see also Dineen v. Pella Corp.*, No. 14-CV-03479, 2015 WL 6688040, at *3 (D.S.C. Oct. 30, 2015) (same under Fourth Circuit approach).

As an initial matter, Florida Statutes § 95.051, the Florida state statute on tolling, "appears to preclude the application of class action tolling." *Dineen*, 2015 WL 6688040, at *3. Florida Statutes § 95.051 "delineates an exclusive list of conditions that can 'toll' the running of the statute of limitations." *Id.* (citing *Major League Baseball v. Morsani,* 790 So.2d 1071, 1075 (Fla. 2001)). "Implicit in the court's holding [in *Major League Baseball*] is the conclusion that in order for a doctrine to 'toll' the statute of limitations, it must be included in the exclusive list of conditions set forth in section 95.051(1)." *Id.* (citing *HCA Health Servs. of Fla., Inc. v. Hillman,* 906 So.2d 1094, 1100 (Fla. Dist. Ct. App. 2004)). "The commencement of a class is not included among the tolling conditions listed in [section] 95.051[,] . . . strongly suggest[ing] that class action tolling is not recognized under Florida law." *Id.* Indeed, citing to section 95.051, the Second Circuit has held that "Florida does not allow tolling during the pendency of class action lawsuits no matter where they are filed." *Becnel v. Deutsche Bank, AG*, 507 F. App'x 71, 73 (2d Cir. 2013); *Adams v. Deutsche Bank AG*, 529 F. App'x 98, 100 (2d Cir. 2013) ("Because Florida so clearly prohibits tolling during the pendency of class action lawsuits, regardless of where filed, the . . . Plaintiffs' claims are time-barred."[33] (citing *Becnel*, 507 F.

---

[33] Normally, even on issues of state law, this Court would be bound by Second Circuit precedent (and that of the highest court of the relevant state). *See Euro Tr. Trading S.A. v. Uralsib Ins. Grp.*, No. 09-CV-4712, 2009 WL 5103217, at *1 (S.D.N.Y. Dec. 23, 2009). *Becnel v. Deutsche Bank, AG*, 507 F. App'x 71 (2d Cir. 2013), and *Adams v. Deutsche Bank AG*, 529 F. App'x 98 (2d Cir. 2013), however, are both non-binding summary orders. Indeed, in *Becnel*, the Second Circuit specifically chose to decide the case by summary order given the rarity with which courts in the circuit interpret Florida law and to allow future panels to "retain the freedom to certify questions" on the matter. *Becnel*, 507 F. App'x at 73 n.3.

App'x at 73)).

Despite the language of Florida Statutes § 95.051, the Florida Supreme Court has allowed putative class members to file *individual* state law claims shortly after the dissolution of a previously filed class action. *See Engle v. Liggett Group, Inc.,* 945 So.2d 1246, 1277 (Fla. 2006); *Lance v. Wade,* 457 So.2d 1008, 1011 (Fla. 1984). Plaintiff cites no binding authority allowing successive *class actions* to proceed.[34] Moreover, "even if the courts in *Engle* and *Lance* adopted class action tolling, they did not adopt *cross-jurisdictional* class action tolling." *Dineen*, 2015 WL 6688040, at *4; *see also In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 311 (S.D.N.Y. 2014) ("Cross-jurisdictional tolling is at issue whenever a court considers the timeliness of state law claims originally filed outside that state's courts."), *aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Companies L.L.C.*, 829 F.3d 173 (2d Cir. 2016); *Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, 878 F. Supp. 2d 1009, 1016 (C.D. Cal. 2011) (collecting "numerous cases in which both the putative class action and the later individual action were pursued in federal court, yet the court was presented with cross-jurisdictional tolling issues due to the existence of state law

---

[34] The parties also disagree over the significance of *Korwek v. Hunt*, 827 F.2d 874 (2d Cir. 1987). In *Korwek*, the Second Circuit determined that the *American Pipe* equitable tolling rule did not apply "to permit the filing by putative class members of a subsequent *class* action nearly identical in scope to the original class action which was denied certification." *Id.* at 876. The parties dispute how broadly to interpret the *Korwek* holding. (*See* Pl. Mem. 22; AHR Mem. 21.) *Korwek*, however, is not implicated here because this case is in federal court based on *diversity* jurisdiction. The correct inquiry requires an examination of *Florida* law to determine whether it allows tolling for successive class actions. *Chavez v. Occidental Chem. Corp.*, No. 17-CV-3459, 2018 WL 352810, at *8 (S.D.N.Y. Jan. 10, 2018) ("The *American Pipe* rule, however, applies only to claims arising under federal law and thus implicating federal question jurisdiction."), *reconsideration denied*, No. 17-CV-3459, 2018 WL 620488 (S.D.N.Y. Jan. 29, 2018). Based on *Engle v. Liggett Group, Inc.,* 945 So.2d 1246, 1277 (Fla. 2006), and *Lance v. Wade,* 457 So.2d 1008, 1011 (Fla. 1984), which only allowed individual claims to proceed, the Court concludes that Florida does not allow tolling for successive class actions.

claims"). Even *Sacred Heart Health System, Inc. v. Humana Military Healthcare Services, Inc.*,

on which Plaintiff relies, acknowledged that "[c]ases involving cross-jurisdictional tolling

provide less justification for tolling." No. 07-CV-62, 2008 WL 2385506, at *3 n.9 (N.D. Fla.

June 9, 2008). In view of the significance the Second Circuit has attached to *cross-jurisdictional*

tolling, the Court declines to read into Florida law such an equitable doctrine in the absence of

clear statutory authority or binding case-law.[35] *See Casey*, 653 F.3d at 97 (certifying whether

---

[35] Predicting whether Florida courts would adopt cross-jurisdictional tolling is difficult. States and even secondary sources that have considered cross-jurisdictional tolling are divided on the issue. *See Soward v. Deutsche Bank AG*, 814 F. Supp. 2d 272, 281 (S.D.N.Y. 2011) ("The few states that have considered the issue have been split in both their acceptance of cross-jurisdictional tolling and the rationale for their decision."); *Stevens v. Novartis Pharm. Corp.,* 358 Mont. 474, 484 (2010) ("So called 'cross-jurisdictional tolling' has rarely been addressed, and the few state courts and secondary sources to have considered the doctrine have expressed widely divergent viewpoints."). "Furthermore, little authority exists as to how a federal court in this Circuit decides whether a state would allow cross-jurisdictional tolling when that state has not addressed the issue." *Soward v. Deutsche Bank AG*, 814 F. Supp. 2d 272, 281 (S.D.N.Y. 2011). "Of the federal courts that have considered this issue, most have refused to extend the doctrine into a state that has yet to consider it." *Id.*; *see also In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 312 (S.D.N.Y. 2014) ("Judges in this district have declined to recognize cross-jurisdictional tolling under state law, because such tolling can be applied only if it is clearly recognized by authoritative state court decisions."), *aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Companies LLC*, 829 F.3d 173 (2d Cir. 2016); *but see Famular v. Whirlpool Corp.*, No. 16-CV-944, 2017 WL 2470844, at *8 (S.D.N.Y. June 7, 2017) ("As the Second Circuit has repeatedly instructed, when [state] courts have not decided an issue of state law, it is the federal court's 'job to predict how the [highest state court] would decide the issue [ ].'" (citation omitted)).

To the extent required to predict the direction of Florida law, this Court finds it more likely that Florida courts will not allow cross-jurisdictional tolling given their limited willingness to deviate from the clear statutory language of Florida Statutes § 95.051. Consistent with this understanding, most, if not all, courts to have considered the issue have concluded that cross-jurisdictional tolling does not exist under Florida law. *See, e.g.*, *Adams*, 529 F. App'x at 100; *Becnel*, 507 F. App'x at 73; *Dineen v. Pella Corp.*, No. 14-CV-03479, 2015 WL 6688040, at *4 (D.S.C. Oct. 30, 2015) ("[T]he court finds that Florida law does not allow for cross-jurisdictional class action tolling"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1015, 1026 (N.D. Cal. 2014) ("Finally, the fact that Florida law explicitly does not include cross-jurisdictional class-action tolling also counsels rejecting [plaintiff's] argument on this point.").

equitable or statutory cross-jurisdictional tolling is available under Virginia law); *Becnel*, 507 F. App'x at 73 n.2 (declining to certify "question of whether Florida would recognize cross-jurisdictional tolling to the Florida Supreme Court . . . [because] [t]he Florida statute seems quite clear"); *Adams*, 529 F. App'x at 98 (holding that Florida, unlike Delaware, does not recognize cross-jurisdictional tolling); *see also In re Vitamins Antitrust Litig.*, 183 Fed. App'x 1, 2 (D.C. Cir. May 15, 2006). Thus, Plaintiff's claims, including as to A-7, are limited to those arising after February 24, 2012.[36]

### III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss. As to the breach of contract claims, the Court denies the motion to dismiss as to Defendant AHR, but grants the motion without prejudice as to the Defendant BRE, based on the failure to re-price the units following tender offers below eleven dollars per unit. As to the breach of the implied covenant of good faith and fair dealing claims, the Court denies the motion to dismiss as to all Defendants based on the theory that they declined to exercise their discretion to re-price the shares solely for their own benefit. All claims are limited in time to events occurring on or after February 24, 2012.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 30, 2018
       Brooklyn, New York

---

[36] The Court notes that it is denying tolling as to Plaintiff's request "to bring claims on behalf of the class." (Pl. Opp'n 25.)